STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-1292

CAROLYN DAVIS

VERSUS

TRI-PARISH REHABILITATION

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 10-11305
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of John D. Saunders, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

AFFIRMED.

H. Douglas Hunter
Guglielmo, Lopez, Tuttle, Hunter & Jarrell
P. O. Drawer 1329
Opelousas, LA 70571
(337) 948-8201
COUNSEL FOR DEFENDANT/APPELLANT:
    Tri-Parish Rehabilitation

R. Scott Iles
Attorney at Law
P. O. Box 3385
Lafayette, LA 70502
(337) 234-8800
COUNSEL FOR PLAINTIFF/APPELLEE:
    Carolyn Davis

**GREMILLION, Judge.**

The defendant, Tri-Parish Rehabilitation, appeals the judgment of the workers compensation judge (WCJ) in favor of the plaintiff-employee, Carolyn Davis. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Davis, a certified nursing assistant, injured her back while transferring a patient from a bed to a wheelchair in June 2003. She filed a disputed claim for compensation with the Office of Worker's Compensation (OWC) on December 8, 2010, claiming that the employer failed to authorize a shower chair, a memory foam mattress, and an MRI of her left knee. Davis sought penalties and attorney fees. In an amended answer filed on March 1, 2012, Tri-Parish claimed Davis forfeited her benefits pursuant to La.R.S. 23:1208. Following a trial on March 7, 2012, and May 8, 2012, the WCJ found in favor of Davis. It ordered Tri-Parish to provide a memory foam mattress and approve an MRI of Davis' knee.[1] It assessed Tri-Parish with a penalty of $6,000 and awarded attorney fees of $11,750. It further denied the defenses asserted by Tri-Parish under La.R.S. 23:1208.[2] Tri-Parish now appeals. Davis answered the appeal seeking an increase in attorney fees associated with defending the appeal.

## ISSUES

Tri-Parish assigns as error:

1. The Office of Workers' Compensation was manifestly erroneous in ordering the defendant to authorize an MRI that is no longer necessary and assessing penalties and attorney fees for its failure to do so.

---

[1] The shower chair had been given to Davis by the time of trial.
[2] Tri-Parish incorrectly filed a Motion for New Trial, which it later dismissed.

2. The Office of Workers' Compensation was manifestly erroneous in ordering the employer to authorize the memory foam mattress and assessing the employer penalties and attorney fees for its failure to do so.

3. The Office of Workers' Compensation was manifestly erroneous in assessing the employer penalties and attorney fees for failing to timely authorize the shower chair.

4. The OWC was manifestly erroneous in finding that Ms. Davis did not violate La.R.S. 23:1208 resulting in a forfeiture of her right to all benefits.

**OPINION**

The "manifest error-clearly wrong" standard is the well-settled standard of review applicable in workers' compensation cases. *Dean v. Southmark Constr.*, 03-1051, p.7 (La. 7/6/04), 879 So.2d 112, 117.

> Accordingly, the finding of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander [v. Pellerin Marble & Granite*, 93-1698 (La. 1/14/94),], 630 So.2d [706,] 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir. 2003), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Robinson*, 865 So.2d at 105.

*Id.*

Davis testified on the first day of trial, March 7, 2012. She said that she was prescribed the mattress on August 31, 2009 as evidenced by the prescription submitted into evidence. Davis said that the mattress had yet to be approved as of the date of trial. The shower chair was prescribed on October 25, 2010. Davis could not remember exactly when she received it, but she said that it was more than two months (60 days) after she requested it.

2

The MRI prescription is dated July 5, 2010. Davis testified that she has ongoing and worsening back and left knee pain. She walks with a cane due to the pain and because she sometimes loses balance. She said her left knee had been bothering her since the day of her injury. She testified that she uses the cane all of the time. She said that she cannot stand or sit for too long.

Gary Williams, an adjuster with Risk Management Services, the third-party administrator for Louisiana Commerce and Trade Association, (LCTA), worker's compensation fund, for sixteen years, testified that he began working on Davis' claim in May 2010. He essentially testified that Davis' claim for a shower chair was unwarranted as she could be seen on video standing for long periods of time. He further testified that he reviewed Dr. Gunderson's medical records and that a left knee injury was never documented as having resulted from the work-related accident. Williams stated that Davis only uses her cane when picking up her disability check at the social security administration office and for the FCE, but does not otherwise regularly use it. He described viewing the surveillance of Davis engaged in "quite vigorous activity" the day before her FCE.

Williams eventually approved the shower chair months after the prescription was written and after the dispute was filed. He said that he approved it based on his attorney's recommendation, but that there was no medical reason to approve it.

Gene Sittig, a field investigator for Quality Investigative Group for the past seven years, testified that he conducted the video surveillance of Davis. He said that he recorded any movement whether it appeared to be helpful or hurtful. Sittig only videotaped Davis for two days in January or February of 2012.

The April 12, 2012 deposition of David Regan, a licensed physical therapist, was submitted into evidence. Regan conducted the FCE of Davis on February 24, 2012. He described all of the detailed physical activities that Davis was required to perform and deemed the results "conditionally valid" finding that the "client has not intentionally manipulated the results but has demonstrated an early termination point." Regan noted that Davis arrived and left using a cane, but did not use it during the assessment. As to her level of activities, Regan assigned her a sedentary level of capability based on what she demonstrated as her safe level of capabilities according to the assessments and the activities that she participated in. Davis stated that "she was capable of performing something a little bit greater than what she demonstrated."

Dr. Clark Gunderson's April 30, 2012 deposition was submitted into evidence.[3] Dr. Gunderson, Davis' treating orthopedic surgeon, stated that he performed a discectomy on April 26, 2004, and a repeat discectomy and fusion on July 25, 2005. In January 2006, he referred Davis to Dr. Lopez, a pain management specialist. Dr. Gunderson's January 2012 notes indicate that she complained of pain in left knee, "which she said was related to this injury." Regarding whether the left knee pain was related to the work accident, Dr. Gunderson stated, "when I first saw her, I had said she had pain going down her left leg to the knee and then I asked her about it later, more recently. And she said, 'Well, that's when it all started.' I don't have anything in my file dating back to then." Dr. Gunderson said that he could not really offer an opinion one way or the other.

_____

[3] Dr. Gunderson was deposed a second time by Tri-Parish between the first and second day of trial.

Regarding the video surveillance, Dr. Gunderson concentrated on the day before and after the FCE and stated:

A. Yes. They were basically of her standing outside, her bent forward posture. She did very little bending or stooping. She moved very slow. She stood bent forward, like I mentioned. At one time, she was standing outside, I don't know where. Another time she was standing on the porch of her trailer house.

Q. Yes.

A. You know, there really wasn't very much in the video that would affect my impression.

Later Dr. Gunderson was asked

Q. . . . If she complained of pain to her knee as early as your first visit with her and has never had leg and knee pain abate since her injury, is there a reasonable medical probability that the symptoms in her knee are related to her accident that she reported to you?

A. Probably.

On cross-examination, Dr. Gunderson was asked again whether the knee complaints were related to the accident and he said that he could only say that "the patient told me that she's had knee problems ever since this accident."

Regarding whether the pain was radicular in nature, he was questioned;

Q. . . . Was she reporting a knee injury at that time or was this just radicular pain coming down from the back?

A. Well, it appears that most of it was coming down from the back to the leg; that was radicular pain.

Q. Any indication in your early records of a separate knee injury?

A. Well, her accident was a lifting a patient from a bed to a wheelchair –

Q. Sure.

A. – so that would point toward a back problem as opposed to a knee problem, although she did have pain radiating into the knee.

5

Q. Would you agree with me that pain radiating to the knee would have originated most likely in the lumbar spine, not in the knee itself?

A. Yes

. . . .

Q. But if you resolve the back pain with a good bit of success with surgery but she still has pain into the knee and she still walks with a limp, that does feel like there could be a secondary injury that would justify an M.R.I. of the knee; right?

A. Yes.

Dr. Gunderson was also deposed on August 9, 2011. He agreed with defense counsel that Davis's knee problem was related to her lumbar spine.

Q. Now, there are mentioned in all of your reports of left leg pain, maybe even left knee pain. All of those referred to radicular components; correct?

A. Yes.

Q. And that's emanating from the disc injury that she had in the low back?

A. Yes.

However, on cross-examination, Dr. Gunderson was questioned by Davis' counsel:

Q. Now, if a patient has an injury where the mechanics are she is a nurse's aide and a patient's fallen and she has to bend and twist and go to the floor to keep nursing home patient from falling and the patient develops back pain that goes to the knee, and included in this hypothetical question of a back surgery she still has some residual knee problem, it is a reasonable medical probability that if the knee pain hasn't resolved that she could have an overlap of both a knee injury –

A. Yes.

Q. – as well as a low back injury?

A. Yes.

6

He concluded that an MRI of the knee was a reasonable test for the patient, but that over the four years he treated her beginning in 2003 he would have expected to discover the knee injury independent from the radiculopathy.

Dr. Lopez was deposed on August 16, 2011. He began-treating Davis in November 2006.

> Q. Okay. Now then, there was an issue that arose about a left knee M.R.I.
>
> . . . .
>
> A. That came about from Carolyn's complaints of knee pain and I initiated the request for an M.R.I. and later I continued to pay more attention to the back, and the need for the M.R.I. of the knee sort of dissipated.
>
> Q. So that's no longer an issue?
>
> A. That's no longer an issue either.

Dr. Lopez discussed the shower chair and memory foam mattress recommendation. He said "it sounded like a good idea with the complaints that she has of poor sleep and the way that I see her maneuvering here in the office." He was questioned:

> Q. . . . The M.R.I of the left knee, you wrote a prescription for it on July 5, 2010. Is it still reasonable and necessary now in 2011? And if not, what has changed, if you don't mind?
>
> A. Her complaints at that time was of knee pain, in that left knee. The complaints have localized more as a neurologic type of pain from the back to the leg. This joint pain has not been a concern in the last at least six months."

Dr. Lopez said he would defer to Dr. Gunderson as to whether the work accident caused any knee injury.

7

However, Dr. Lopez's progress notes taken on the patient dated June 21, 2003, October 25, 2010, December 20, 2010, January 17, 2011, February 14, 2011, March 14, 2011, and June 16, 2011 , all indicate left leg pain.

The trial court provided extensive oral reasons for its judgment, stating, in pertinent part:

> [T]he sum, total and extent of this 2010 controversy involves a shower stool, a mattress, and an M.R.I. of the worker's knee, all of which was prescribed by the worker's treating physician months and months ago.
>
> And after all these months and months of deliberation, the employer finally provided a shower stool for Ms. Davis. I cannot imagine what was so challenging about deciding to authorize a $50 shower stool that a physician said was necessary for personal hygiene.
>
> And, I'm no less puzzled by the mattress issue. The rationale offered by the insurer for its reluctant, indeed refusal, to authorize the type mattress recommended by the treating physician goes like this: we could all benefit by having an expensive mattress; this woman doesn't need one any more than the rest of us, and the only reason her physician prescribed one is that she asked him to do so. And it does look like that's what happened, but I am unaware of any Third Circuit reported cases which suggest that an insurer can with impunity ignore a doctor's prescription for a claimant if it can be shown that the claimant specifically requested that prescription, be it either medicinal or palliative.
>
> And, utterly and conspicuously absent from the defense rationale is any support from any physician, of any specialty from anywhere who agrees with the insurer that the mattress is not necessary.
>
> As related to the knee M.R.I., the medical evidence is decidedly devoid void of any suggestion that the original (and really the only treating orthopedic surgeon) thinks that the knee M.R.I. is not required any more. The defense does not really argue that point, preferring to rely on what it considers the pain management physician's view of the subject.
>
> But, I read carefully the deposition of Dr. Lopez and I understand him to have said that as treatment proceeded, he began to pay more attention to Ms. Davis' back problems and, as he put it, "the M.R.I. of the knee sort of dissipated." The treating orthopedic surgeon, Dr. Gunderson, never, as far as I can see, indicated that he changed his mind on the necessity of a knee M.R.I. And, I will point out, that

the defense had ample occasions to find out precisely what Dr. Gunderson thought, having deposed him twice.

But all of that aside, the over-arching rationale by the defense for its handling of this claim is its insistence that Ms. Davis is a malingering cheat who has consistently either manufactured or exaggerated her symptoms for no other reason than to defraud her employer and its insurer.

To support this argument, the defense relied on video surveillance, along with Ms. Davis's performance during a functional capacity evaluation.

I grant that some legitimate questions might be raised by the insurer based on Ms. Davis's F.C.E. But there's a lapse of logic which sees an F.C.E. conducted in February of 2012 as a basis for denying a prescription mattress written by a pain management physician in 2009, or an M.R.I. requested in 2010.

The efficacy of the denial of prescriptions is measured by what the denier knew when the request was refused, not how farsighted and correct the insurer might be years from the request date.

. . . .

But the surveillance videos standing on their own are in no way and in no fashion strong enough to be considered proof positive that this woman is not disabled. This opinion seems to be shared by her treating orthopedic surgeon, Dr. Gunderson, who performed two separate lumbar surgeries on her and who has firsthand knowledge of her situation.

### *La.R.S. 23:1203(A)*

An employer has a duty to provide all reasonable and necessary medical care and equipment to a claimant for her work-related injury. La.R.S. 23:1203(A); *Wilczewski v. Brookshire Grocery Store*, 08-718 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214, *writ denied*, 09-456 (La. 4/13/09), 5 So.3d 170.

Although Tri-Parish eventually provided the shower chair shortly before the trial began, the trial court did not err in finding that it unnecessarily delayed in doing so.

Regarding the memory-foam mattress and the M.R.I., Tri-Parish claims it already had the surveillance video when these requests were made; thus, their refusals to authorize was reasonable. We disagree. Dr. Frank Lopez prescribed the memory foam mattress on March 31, 2009. A prescription for an MRI of the left knee was written by Dr. Lopez on July 5, 2010. Tri-Parish submitted five CDs of video surveillance into evidence.[4] The surveillance videos submitted into evidence were dated September 20, 2010, October 1, 2010, November 10-11 and 23-24, 2010, March 11, 2011, March 19, 2011, and February 23-25, 2012. A functional capacity evaluation (FCE) was conducted on February 24, 2012.

We reviewed all of the video surveillance and agree with the trial court. The surveillance submitted into evidence was conducted months after the prescribed mattress pad and M.R.I. The video surveillance, particularly the surveillance conducted between September 2010 and March 2011, is remarkably uneventful. The surveillance does not present significant credibility issues as testified to by Dr. Gunderson. Nor was there any real challenge of the necessity for the M.R.I. of the knee. While there is some conflicting medical testimony about the origin of the knee injury (i.e. radicular in nature or a separate injury), it is not sufficient to counter the evidence in favor of Davis and the trial court cannot be said to have manifestly erred in its finding. Additionally, as pointed out by the trial court, the employer cannot endlessly delay approval of a procedure in the hopes that it will no longer be required.

---

[4] The surveillance video taken on March 3, 2011 and March 19, 2011 (Exhibit D 7-C) was not included in the record.

*Penalties and Attorney Fees*

An employer is subjected to penalties and attorney fees if it fails to pay medical benefits timely unless the claim is reasonably controverted. La.R.S. 23:1201(F). "In order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits." *Guillory v. Bofinger's Tree Service*, 06-86, p. 14 (La.App. 1 Cir. 11/3/06), 950 So.2d 682, 692. A WCJ's finding regarding penalties and attorney fees is a question of fact that will not be reversed absent manifest error. *Maddox v. Texas Gas Transmission Corp.*, 07-906 (La.App. 3 Cir. 12/05/07), 971 So.2d 541, *writ denied*, 08-64 (La.3/7/08), 977 So.2d 911.

Based on our review above, the trial court did not err in assessing penalties of $6,000 and attorney fees of $11,750.

### La.R.S. 23:1208

An employee forfeits her right to compensation benefits when she willfully makes false statements or misrepresentations in order to obtain benefits or payments. La.R.S. 23:1208; *Resweber v. Haroil Const. Co.*, 94-2708 (La. 9/5/95), 660 So.2d 7. Whether an employee has forfeited her rights under La.R.S. 23:1208 is a question of fact that will not be reversed on appeal absent manifest error. *Smith v. Quarrels Drilling Co.*, 99-171 (La.App. 3 Cir. 6/2/99), 741 So.2d 829 *writ denied*, 99-1949 (La. 10/8/99), 751 So.2d 227.

Clearly Tri-parish and the WCJ had vastly different interpretations of the surveillance video. Where conflict in the testimony exists, a factfinder's choice cannot be manifestly erroneous. *Dean*, 879 So.2d 112. As discussed above, we watched all of the surveillance video, and none of the actions on the surveillance tapes triggers a forfeiture of benefits. The WCJ considered the medical and

11

surveillance evidence and found that Davis did not intentionally misrepresent her condition. We find no error in the trial court's finding that that Davis's benefits were not subject to forfeiture under La.R.S. 23:1208.

*Attorney Fees on Appeal*

Davis answered Tri-Parish's appeal and requests an additional $5,000 for work performed pertaining to the appeal. We award Davis $4,000 for work performed on appeal.

## CONCLUSION

The judgment of the WCJ in favor of the plaintiff, Carolyn Davis, is affirmed. All costs of this appeal are assessed against the defendant, Tri-Parish Rehabilitation.

**AFFIRMED.**